ELLIS, Judge.
Joseph McCastle, a Negro male in his mid-twenties, brought this suit for damages, alleging that he suffered a traumatic neurosis on April 26, 1962 at 2:00 A.M. On that date James H. Woods drove his father’s automobile into a house in which plaintiff was sleeping. The house was completely demolished and plaintiff was thrown from his bed and partially covered with debris. Home Indemnity Company is the liability insurer of the father, T. H. Woods.
The negligence of James H. Woods was admitted and, at defendant’s request, the case was tried before a jury which rendered a verdict in favor of plaintiff for $2500.00. The defendant has appealed and the plaintiff has answered the appeal, both seeking a more favorable award.
On March 29, 1962, plaintiff was injured while employed by Richards Ford, Inc. A resulting workmen’s compensation suit was compromised for $750.00 on June 28, 1963. The injury complained of was acute lumbo-sacral strain, though there was also an allegation of “severe traumatic neurosis”. Dr. A. K. Mclnnis, Jr., was qualified by plaintiff as an expert witness in the field of orthopedic surgery and testified that on March 29, 1962 he saw plaintiff in the emergency room of Baton Rouge General Hospital and that plaintiff appeared to be in a great deal of discomfort. A diagnosis of acute lumbosacral strain was made at that time. Dr. Mclnnis testified that treatment for this produced gradual improvement
“until April 10, 1962, at which time his complaints became somewhat bizarre. He complained of pain in his abdomen, pain in his groin, pain in his legs, none of which could be attributed to the injury which he had sustained * * *. On April 19, 1962, I saw this patient again. His complaints continued. I could no longer find any reason for them, and that was the last time that I saw him prior to his incident at his house.”
Dr. Mclnnis saw the plaintiff at the emergency room of Baton Rouge General Hospital soon after the auto struck the house. In describing that, Dr. Mclnnis testified as follows:
“Examination at this time showed that he was very excited. He was very difficult to evaluate and examine, but examination at this time failed to reveal any spasm, failed to reveal any tenderness, failed to reveal any evidence of any external violence on his body whatsoever.”
X-rays taken on this occasion were negative but the plaintiff remained in the hospital four days for evaluation and observation during which time he was most uncooperative and refused to allow Dr. Mclnnis to examine him. On April 30, having found no objective substantiation of the subjective complaints, plaintiff was released and did not see Dr. Mclnnis again in connection with the April 26th accident. Dr. Mclnnis further testified that he felt plaintiff’s complaints were grossly and deliberately exaggerated and that plaintiff was a malingerer. Dr. Mclnnis also felt that the plaintiff had become more difficult after the second accident than before.
*423 Dr. Joseph Sabatier was plaintiffs second expert witness to testify. Dr. Sabatier was accepted as an expert in the field of general surgery. He examined plaintiff about three weeks after the second accident and testified that:
“I am unable to demonstrate any objective evidence of abnormality which could account for this patient’s symptoms. It is highly probable in my estimation that all of this man’s symptoms are feigned.”
Dr. Sabatier explained that this meant the symptoms
“are not based in fact, that they are not actually experienced. As I stated it is highly probable. I can’t state this with any certainty. I think that this is a question for a psychiatric decision.”
Further explaining, Dr. Sabatier testified:
“In my mind, in my considered opinion, I mean to clarify this as much as I can, I think that this man did not genuinely suffer these complaints that were given to me as symptoms.”
Dr. Bruce Ivy submitted a written report and this was admitted by consent in lieu of his testimony. Dr. Ivy examined plaintiff on several occasions commencing May 1, 1962. In a report dated November 16, 1962, Dr. Ivy wrote:
“ * * * ■ however, the patient attempted to show a poor grip and weakness in his upper extremities which seemed to be ‘put on’. It was noticed that while he was being observed he walked in a stiff, short step manner; however, it was noted by me as well as other doctors and nurses in my clinic and in other clinics that when he thought he was not being observed he walked fairly normal. When distracted the patient would move normally with no limitation of motion, undressed and dressed himself without any difficulty; however, at the time of the examination it was a completely different picture. I, as other doctors who have examined him, feel that the patient is borderlining mental acuity and probably has some mental illness with auditory and visual hallucinations. His disability more or less is primarily of a malingering nature. If by history and investigation of past employers, family and acquaintances, this patient was completely normal prior to the accident then the possibility of a traumatic neurosis, or that of a well compensated psychotic thrown over the line due to trauma or the like could be considered.”
Similar evidence of intentional overstatement and overacting was mentioned by Dr. A. K. Mclnnis.
The condition set up by Dr. Ivy, that of a normal background, has not been met. Plaintiff had been convicted of burglary, vagrancy, and theft. He had moved from job to job and had an illegitimate child in California that he did not support.
Dr. Richard Means was presented by plaintiff as an expert in the field of orthopedic surgery and readily accepted as such by defendants. Dr. Means examined plaintiff on April 17, 1962 and found that plaintiff moved about with ease except when requested to demonstrate his limitations. Plaintiff at that time, some nine days before the accident of the 26th, was complaining of a very painful back, an inability to move about, a “loss of wind” (difficulty in talking and breathing), radiation pain to the abdomen, radiation pain into the epigastric region and into the upper abdomen. There were no objective findings of injury on that date. Dr. Means was of the impression that plaintiff was deliberately and consciously exaggerating his condition.
Dr. Moss Bannerman was presented next as an expert in the field of orthopedic surgery and accepted by defendants. Dr. Bannerman examined plaintiff on April 11, 1962 and testified that:
“This man is deliberately exaggerating his complaints greatly and shows at the *424 present time no positive physical findings, and it is my belief that he had not sustained any serious injury at the time of the alleged accident. It is my opinion he can be discharged from further treatment and allowed to return to work.”
Subsequent examination on June 11, 1963 did not alter Dr. Bannerman’s findings. On August 1, 1963 Dr. Bannerman again saw plaintiff and described him as “nervous and distraught”. Dr. Bannerman felt plaintiff was consciously or unconsciously exaggerating his symptoms.
Dr. S. H. Wyatt had given a discovery deposition which was admitted into the record by consent. Dr. Wyatt is a psychiatrist. He saw plaintiff briefly on August 14, 1962 and again on the 17th and 24th of that month. The next visits were December 7 and 28th of 1963. Dr. Wyatt, too, felt plaintiff was exaggerating his complaints but nevertheless diagnosed his mental condition as post-traumatic neurosis manifested by hypochondriasis. The latter term refers to one’s unfounded notion that his body is ill, injured, diseased, or otherwise disabled. In Dr. Wyatt’s opinion the plaintiff was actually suffering the symptoms he related though they were caused by his mental rather than physical condition. Dr. Wyatt also felt plaintiff had paranoid tendencies with reference to the pending litigation. Dr. Wyatt, as well as Dr. Ivy, actually feared plaintiff.
Dr. Harold Voss, an expert in the field of internal medicine next testified for the plaintiff. Dr. Voss saw plaintiff on July 20, 1962 on referral from Dr. Ivy. An examination revealed no physical defects which could possibly account for plaintiff’s many complaints. Dr. Voss wrote to Dr. Ivy as follows:
“It is my feeling that this man obviously had trauma but that at the present time I can find no evidence of disability from this. I feel that this patient has a borderline mental acuity and probably has mental illness with auditory and visual hallucinations. It is my feeling that his disability at this time is primarily of a malingering nature and is not present on objective examination. Therefore, my diagnosis is multiple contusions with disability resolved, probable mild mental deficiency, probable chronic mental illness with hallucinations both auditory and visual.”
Dr. Voss found that plaintiff attempted to display his symptoms when he thought he was being observed, but not otherwise.
Dr. L. F. Magruder was accepted by the lower court as an expert in the field of psychiatry over objection from defendant. The doctor did not have any formal training in psychiatry but has had extensive practice in the field and has been accepted in other courts as an expert. We believe the objection was properly overruled. Dr. Magruder examined plaintiff on three occasions, November IS and 22 and December 12, 1963. Dr. Magruder made a tentative diagnosis of psychoneu-rotic reaction, dissociative type, but admitted that there is a possibility that the mental disorder is schizophrenia, paranoic type. During the first interview plaintiff would stutter, lapse into periods of silence, cry and complain of pain in his upper chest. On the second visit he was more pleasant and spontaneous and appeared improved. A history was obtained from the father on this occasion, and it was on this history and that obtained from plaintiff himself that Dr. Magruder largely based his opinion. Dr. Magruder believed that the accident of the 26th precipitated the mental condition and that the previous accident started the mental degeneration.
It was obvious, however, that Dr. Ma-gruder conditioned his opinion insofar as causation was concerned on plaintiff having been normal and well adjusted prior to the 26th. As has already been pointed out, this was not the case. Dr. Magruder could *425 not explain why plaintiff had so many complaints before the 26th except to say that the second accident was, while still an important causative factor, less important than he had at first believed. Nor could Dr. Magruder say what plaintiff’s condition would have been had the second accident not occurred. Dr. Magruder also admitted plaintiff was exaggerating his complaints.
Dr. Richard Levy, an expert in the field of neurological surgery, was the sole expert witness for the defendant. He examined plaintiff on December 21, 1962 and found plaintiff unable to pass an elementary mental test, complained of poor memory, and was approximately oriented. He had complaints referable to nearly every body system. Dr. Levy found that •
“The entire examination, in my opinion, was marked by severe overreaction by the patient to all of the test maneuvers that I carried out.”
Dr. Levy found no organic disorders.
In addition'’ to the medical testimony, plaintiff called some relatives and friends to testify as to his changed mental condition. One of these friends, Sterling Shoales, testified the plaintiff didn’t act different after the accident.
It appears to be a general concensus of the many doctors who testified that plaintiff suffered no real physical injury from the accident of the 26th. We believe, however, that plaintiff is entitled to recover for shock and mental anguish and accordingly award plaintiff the sum of $1000.00 plus the amount of the hospital bill ($123.70) and the amount of Dr. Mclnnis’ bill ($40.00) for treatment on that occasion.
Plaintiff has failed to prove, however, that he has a mental illness. In view of the testimony of his own witnesses that he is a malingerer and that he deliberately overstates and overacts his symptoms and that he feigns disability when being examined but not otherwise, we cannot say that he is mentally ill.
A second reason for denial of recovery lies in the fact that, assuming plaintiff is mentally ill, this illness had certainly manifested itself prior to April 26th. Plaintiff’s complaints before that date had become rather bizarre and may well have progressed without the second accident.
The verdict of the jury is amended and reduced to the sum of $1163.70.
Amended and affirmed.